[No. F002248. Fifth Dist. Aug. 15, 1984.]

In re MARK K., a Person Coming Under the Juvenile Court Law.
DEPARTMENT OF SOCIAL SERVICES, Petitioner and Respondent, v.
HAROLD K., Objector and Appellant.

**COUNSEL**

Quin Denvir and Frank O. Bell, Jr., State Public Defenders, under appointment by the Court of Appeal, and Christine Zilius, Deputy State Public Defender, for Objector and Appellant.

David J. Beauvais, under appointment by the Court of Appeal, for the Minor.

Floyd R. B. Viau, County Counsel, and Vincent J. McGraw, Deputy County Counsel, for Petitioner and Respondent.

OPINION

**WOOLPERT, J.**—Is the traditional summary judgment procedure available to avoid the necessity of a trial in a special proceeding brought to declare a child free from the custody of his natural father? We hold it is not.

In April of 1982, Fresno County, through its Department of Social Services, filed a petition to free Mark K., a minor, from the custody of his natural father, Harold K. The petition was filed on the grounds set forth in Civil Code section 232, subdivision (a)(5) (parent previously judicially declared mentally ill) and subdivision (a)(6) (parent found to be mentally disabled).[1] Numerous allegations were contained in the petition, and a number of exhibits were attached.

A guardian ad litem was appointed for the father, and the Fresno County Public Defender's Office was appointed to represent him. A guardian ad litem was also appointed for the child.

Notice of the hearing was provided to the father and arrangements were made for his transportation from Atascadero State Hospital to Fresno for psychiatric examination. Orders were made requesting certification by the Director of Atascadero State Hospital that the father was developmentally disabled and not capable of supporting or controlling the child. In addition, an order was made appointing psychiatrists to examine the father. A hearing was held and trial date set.

In January 1983, the county filed a motion for summary judgment. Supporting declarations were also filed. Points and authorities in support of the motion were filed by the county and by the attorney for the child. Points and authorities opposing the motion were filed by the father. Notably, no counter declarations were filed.

The motion for summary judgment was granted in February, 1983. This appeal followed.

### SUMMARY JUDGMENT FACTS

All parties agree that the facts are as set forth in the declarations and matters for judicial notice which accompanied the summary judgment mo-

---

[1] All statutory references are to the Civil Code unless otherwise indicated.

tion. We highlight them. The father had a long history of mental problems. He was twice married, both times to women who likewise suffered from mental illness. The second marriage resulted in the birth of the minor in the present case.

Shortly after the minor's birth the parents' home was visited by a Fresno County public health nurse. Based upon observations of the parents and child, the nurse referred the child for a child protective services investigation. After an extensive investigation the father was permitted to retain custody. This lasted for only a short time.

After a visit by a social worker to the home, an examination by a psychiatrist with the mental health department, and a recommendation by an officer of the Fresno Police Department, it was determined the minor should be removed from his father's care and placed in protective custody.

Meanwhile, the mother was determined to be suffering from a long-term psychiatric problem which required hospitalization. It was again determined that the father was incapable of caring for the child. A case plan was developed which included placing the child in a foster home and allowing visitation rights by the parents. Adoption was anticipated should the parents continue their inability to cope. The child was unsuccessfully placed with a relative. In March 1981, the child was adjudged a dependent of the court, ordered removed from the physical custody of its parents, and placed in a licensed foster home.

In August an information filed by the Fresno County District Attorney's office alleged, in two counts, that the father had violated Penal Code sections 211 (robbery) and 245, subdivision (a) (assault with a deadly weapon or force likely to produce great bodily injury). Although convicted on both counts, he was found to be not guilty by reason of insanity. He was then committed to Atascadero State Hospital for a period of approximately seven years.

Early in 1982 the parental rights of the natural mother of the child were terminated in an uncontested proceeding. The present action to terminate the father's parental rights was then commenced. After the petition was filed the father requested a jury trial in the criminal case on the question of whether he continued to be a danger to others. After failing to convince the jury of his present sanity, he was returned to the hospital.

SUMMARY JUDGMENT WAS AN IMPROPER REMEDY

The father concedes that "[a]ny party may move for summary judgment in *any action* or proceeding . . . ." (Code Civ. Proc., § 437c, subd. (a),

italics added.) He argues, however, that "any action or proceeding" means any regular civil action, and that proceedings to terminate parental rights are actually quasi-criminal, *not* regular civil actions. The father relies upon the following language from *In re Christina L.* (1981) 118 Cal.App.3d 737, 745 [173 Cal.Rptr. 722]: " '[T]he very essence of the proceeding is the complete and final legal termination of a relationship which is biological in nature and most personal in form. [Citations.][' ] (*In re Angelia P.* (1981) 28 Cal.3d 908, 916 [171 Cal.Rptr. 637, 623 P.2d 198].) The court-ordered severance of parental ties in effect punishes the parents for their inadequacy."

■ Supporting this argument is the fact that a termination proceeding requires a higher standard of proof than does the usual civil action. The standard of proof in such a proceeding is clear and convincing evidence. (*In re Angelia P.* (1981) 28 Cal.3d 908, 918 [171 Cal.Rptr. 637, 623 P.2d 198]; see also Civ. Code, § 232, subd. (c).) A similar standard was imposed by the United States Supreme Court. (*Santosky* v. *Kramer* (1982) 455 U.S. 745 [71 L.Ed.2d 599, 102 S.Ct. 1388].) However, the particularly sensitive subject of an individual's right to personal freedom is not present in termination proceedings. (*In re Angelia P., supra,* 28 Cal.3d at p. 918.) The county seizes upon this distinction to argue that summary judgment is appropriate.

■ Parental rights are fundamental in nature and guaranteed constitutionally. Their importance has been discussed in numerous cases. (*In re Carmaleta B.* (1978) 21 Cal.3d 482, 489 [146 Cal.Rptr. 623, 579 P.2d 514]; see also *In re Angelia P., supra,* 28 Cal.3d at p. 916, stating that although fundamental, "parental rights are not absolute" and must be balanced with competing state interests.)

We cannot reach a firm conclusion by simply comparing the importance of various personal rights. However, there may still be some place for this thought: "It never could have been, or in justice ought to have been, the intention of those who framed our Practice Act and rules thereunder that the decision of such a serious question as this should be flung off on a motion for summary judgment. Whatever the final judgment may be, the defendants were entitled to have the issue deliberately tried, and their right to be heard in the usual manner of a trial protected." (*Gravenhorst* v. *Zimmerman* (1923) 236 N.Y. 22, 38-39 [139 N.E. 766, 772 27 A.L.R. 1465].) ■ Nevertheless, questions of " 'constitutional fact' " may be determined on a summary judgment motion under appropriate circumstances. (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 14 [112 Cal.Rptr. 786, 520 P.2d 10].)

Termination proceedings have long been classified as "special proceedings." (*Moch* v. *Superior Court* (1919) 39 Cal.App. 471, 477 [179 P. 440].) The proceedings have been viewed as so grave that findings of fact and conclusions of law have been deemed mandatory, as a matter of due process, if requested by any party to the proceeding. (*In re Rose G.* (1976) 57 Cal.App.3d 406, 416-418 [129 Cal.Rptr. 338]; compare opinions in *In re Terry D.* (1978) 83 Cal.App.3d 890 [148 Cal.Rptr. 221]; see also discussion in *Guardianship of Baby Boy M.* (1977) 66 Cal.App.3d 254, 262-264 [135 Cal.Rptr. 866].)

We have recently examined the code classifications of "actions" and "special proceedings" and the sometimes confusing relationship of the type of litigation to the kind of remedies and relief available to the litigants. (*Agricultural Labor Relations Bd.* v. *Superior Court* (1983) 149 Cal.App.3d 709 [196 Cal.Rptr. 920].) Generally, "actions" are governed by part 2 of the Code of Civil Procedure. "Special proceedings" are found in part 3 and in other codes. Part 3 special proceedings occasionally contain no practice provisions and instead incorporate part 2 procedures, in whole or in part. Absent such a reference to part 2, in most instances it may be assumed that part 2 procedures are inapplicable to special proceedings.

This uncertain manner of setting forth practice provisions may require legislative clarification. For example, the forcible entry and detainer statutes found in the Code of Civil Procedure, part 3, incorporate the part 2 provisions except as otherwise provided in sections 1159-1179a (part 3). Section 1170.7 specifically permits a modified summary judgment procedure which shortens the time sequence, but otherwise adopts the usual motion procedure. Later, subdivision (n) was added to Code of Civil Procedure section 437c to avoid an apparent conflict in the sections.

■ As a general proposition, summary judgment motions may be available whenever appropriate to any form of action, not because of incorporation language to be found in the special proceeding sections, but instead by virtue of its own language which expressly states its applicability in "any action or proceeding." (*Taliaferro* v. *Coakley* (1960) 186 Cal.App.2d 258, 260 [9 Cal.Rptr. 529] (mandate); *Adoption of Backhaus* (1962) 209 Cal.App.2d 13, 20 [25 Cal.Rptr. 581] (adoption).) By dictum, this court in *Adoption of Backhaus* concluded that the 1953 version of Code of Civil Procedure section 437c, which defined "action" as "all types of proceedings," embraced adoption proceedings. (*Ibid.*) Although summary judgment was reversed, the use of the motion was considered appropriate. We need not determine whether the 1973 revision changing the words to read "in any action or proceeding" continues to justify such a broad view of the section. Courts sometimes find that the "traditional distinction" between

actions of a general nature and special proceedings "must give way" to the needs of the litigation. (*In re Rose G., supra,* 57 Cal.App.3d 406, 418 [part 2 findings required in part 3 termination proceedings].)

■ Adoption and termination proceedings have some similarity; however, the termination procedure has a speedy trial requirement which makes summary judgment procedures inappropriate even if "any action or proceeding" is broadly construed. (§ 232.3.) The Legislature has not provided a modified summary judgment procedure in termination proceedings comparable to those applicable to detainer actions. Having prescribed minimum time periods for process and hearing in termination proceedings, we assume the Legislature would have enacted a similar modified summary judgment procedure if it considered the issue resolving procedure suitable to this "drastic" state action. (*In re Carmaleta B., supra,* 21 Cal.3d at p. 489.)

A similar problem arose in a case involving the Elections Code. In *Anderson* v. *County of Santa Barbara* (1976) 56 Cal.App.3d 780 [128 Cal.Rptr. 707], the court held that summary judgment was not available in election contests which are special proceedings: "Thus the statutory scheme governing election contests requires that trial commence no later than 45 days from the time that notice of the contest is filed with the county clerk. Nowhere in the time limit is there leeway for the pretrial skirmishing and motion practice that has become commonplace in today's traditional lawsuit. In stark contrast, Code of Civil Procedure section 437c prohibits a motion for summary judgment until 60 days from the date of a general appearance have expired. By the time the 60 days [have] run, the trial of the election contest must have been commenced and often will have been concluded. It is not possible to reconcile Code of Civil Procedure section 437c's limitation upon moving for a summary judgment with the time limitations upon commencement of trial of an election contest. Rather than infer a legislative intent to carve out an unstated exception to section 437c, we must construe that statute and Elections Code section 20085 together. Since section 20085 requires that general procedural rules pertain to election contests only if 'applicable,' the fair construction is that the Legislature intended, when it enacted Code of Civil Procedure section 437c, that its provisions were not available in election contests. (See *Packard* v. *Craig* (1896) 114 Cal. 95, 98 [45 P. 1033], holding that a motion for a new trial may not be made in an election contest.)" (*Anderson, supra,* p. 787.)

Termination proceedings likewise are to be heard (set for trial) within 45 days after service of the petition. (§ 232.3, subd. (b).) Although the termination sections do not contain an equivalent "if applicable" provision, the legislative direction to expedite appearances and hearings presumes the

inapplicability of procedural techniques which cannot be accomplished without delaying the conclusion of the special proceeding. (§ 232.3, subd. (a).) Neither the Civil Code termination procedure nor the Elections Code election contest statute allow for continuances which would be compatible with the use of summary judgment motions.

Additional support for the argument the Legislature did not intend termination proceedings to be treated as civil actions under part 2 is found in section 232.3. In that section, the Legislature found it necessary to point out that it intended the service of process and notice requirements of part 2 to be applicable to section 232 proceedings.

Although it appears the trial court was cautious at all times, affording the father the protections of counsel, personal appearance, examination by court-appointed psychiatrists and protracted delays, we conclude that the summary judgment procedure is inappropriate to the statutorily required time periods which have been enacted with consideration for the needs of the parent, the child, and the public. The availability of the motion should not depend upon, or be an excuse for, disregarding these time periods.

### THE CONSTITUTIONALITY ISSUE

The father also challenges the constitutionality of section 232, subdivision (a)(5). We preface our response by stressing that section 232, subdivision (a)(5), is not to be viewed in a vacuum. Other statutory sections and constitutional requirements come into play as a matter of statutory and judicial mandate. This interplay negates all of the father's arguments that the section is unconstitutional.

■ The father claims the statute is vague because it sets no limits as to when the parent was declared mentally ill or how long the parent is likely to so remain. He contrasts subdivision (a)(5) to subdivision (a)(6), which requires a finding that the parent be presently mentally ill as well as a finding that the parent will remain so in the future. We disagree.

Subdivision (a)(5) requires the parent be certified to be incapable of caring for the minor. From an evidentiary standpoint, the certification is a starting point, not an end. Present circumstances must be considered: "It is well settled that an order to free a child from parental custody and control must rest on present circumstances as well as past acts although such prior acts are evidence which may be considered by the court in deciding whether there is sufficient showing to justify the order. (*In re Morrow* (1970) 9 Cal.App.3d 39, 54, 56 [88 Cal.Rptr. 142]; *In re Zimmerman* (1962) 206 Cal.App.2d 835, 844-845 [24 Cal.Rptr. 329]; *In re Cardenas* (1961) 194

Cal.App.2d 849, 855 [15 Cal.Rptr. 238]; *In re Williams* (1955) 133 Cal.App.2d 515 [284 P.2d 510].)" (*In re Carmaleta B., supra,* 21 Cal.3d at p. 493.) "Present circumstances" encompasses the question of whether the parent will likely remain incapable. ▇ Both the "likely to remain" requirement of subdivision (a)(6), and the "will remain" requirement of the earlier version, anticipate nothing more than an informed speculation by experts as to what the future will bring based upon an evaluation of present circumstances. Evidence of present and future incapability were before the court in this case.

▇ Next, the father argues that the term "mental illness" as used in section 232, subdivision (a)(5), is so vague that its meaning cannot be determined, citing *Lanzetta* v. *New Jersey* (1939) 306 U.S. 451, 458 [83 L.Ed. 888, 893, 59 S.Ct. 618]. For example, under the statute, mental illness could be declared under the definition which is used by any court of competent jurisdiction, wherever situated. Mental illness could also be found for any reason—incompetency to make a contract, etc. This argument fails for a number of reasons.

First, all that subdivision (a)(5) of section 232 permits is the action to be *brought* on a prior adjudication basis. The court will still find, by clear and convincing evidence, that termination is necessary. (§ 232, subd. (c).) Therefore, a California court will still determine, by California standards, if the parent is mentally ill, and if that mental illness is detrimental.

Mental illness, as used in an earlier version of subdivision (a)(6), has been defined as follows: "[I]t is manifest that in enacting subdivision (g) of section 232 of the Civil Code it was the legislative intent to embody the concept then set forth in section 5550 of the Welfare and Institutions Code, a portion of that section then being as follows: 'Mentally ill persons,' as used in this code, means persons who come within either or both of the following descriptions: (a) Who are of such mental condition that they are in need of supervision, treatment, care or restraint. (b) Who are of such mental condition that they are dangerous to themselves or to the person or property of others, and are in need of supervision, treatment, care or restraint.' Such provision as to 'mental illness' presents no problem of vagueness or uncertainty. (See *In re Booth,* 212 Cal.App.2d 234, 235 [27 Cal.Rptr. 838].)" (*In re Baby Boy T.* (1970) 9 Cal.App.3d 815, 820 [88 Cal.Rptr. 418], fn. omitted, defining the phrase as it appeared in what is now § 232, subd. (a)(6); see also *In re Eugene W.* (1972) 29 Cal.App.3d 623, 628, fn. 2 [105 Cal.Rptr. 736].)

The father urges that this definition may not be used to save subdivision (a)(5) from attack on constitutional grounds of vagueness. He contends the

subdivision does not refer to the Welfare and Institutions Code, while subdivision (a)(6) does.

This contention is meritless. The Supreme Court has referred to the definition in a broader sense—as if it applies to the use of the term in section 232 generally: "Mentally ill persons under section 232 have been judicially defined as those persons '(a) [w]ho are of such mental condition that they are in need of supervision, treatment, care or restraint' or '(b) [w]ho are of such mental condition that they are dangerous to themselves or to the person or property of others. . . .'" (*In re Carmaleta B., supra,* 21 Cal.3d at p. 490.)

■ As a matter of statutory interpretation, we presume that the Legislature intended the repeated use of identical words or phrases within a single statute to be consistent in their meaning. (*Diachenko* v. *State* (1981) 123 Cal.App.3d 932 [177 Cal.Rptr. 164].) We also assume the Legislature had existing laws in mind when it passed the statute, and that it was aware of existing California decisions. (*Estate of McDill* (1975) 14 Cal.3d 831, 837-839 [122 Cal.Rptr. 754, 537 P.2d 874].) The phrase appeared in subdivisions (a)(5) and (a)(6) at the time *Carmaleta B.* and *Baby Boy T.* were written. (Compare Stats. 1963, ch. 938, § 1, p. 2192, and Stats. 1967, ch. 1052, § 1, p. 2658, with Stats. 1983, ch. 309, § 2.)

■ When a statute is ambiguous, if indeed this one is, its intent may be gathered from other statutes dealing with the same subject matter. (*Estate of McDill, supra,* at p. 837.) ■ Hence, contrary to the father's contention, in defining mental illness as used in subdivision (a)(5), this court may use subdivision (a)(6), the Penal Code sections employed to commit the father in this case, and the Welfare and Institutions Code. Therefore, since the subdivision may be read in an unambiguous way, the father's argument that its vagueness does not provide adequate notice to parents, and delegates too much authority to public officials, is without merit.

■ He further argues that the subdivision is overbroad because it does not require a causal relationship between the parent's inability to care for the child and the parent's mental illness, as does subdivision (a)(6). This problem is solved by the fact that *all* termination proceedings must include a finding that placement with the natural parent would be detrimental to the child. (*In re B. G.* (1974) 11 Cal.3d 679, 699 [114 Cal.Rptr. 444, 523 P.2d 244]; § 4600.) In addition, we also consider it implicit in subdivision (a)(5), that the above detriment is causally related to the parent's mental illness.

Father also argues that since subdivision (a)(5) works a deprivation of a substantial liberty interest, i.e., the right to be a parent, the government must demonstrate "the law is necessary to promote a compelling or overriding interest." (Nowak et al., Constitutional Law (2d ed. 1983) Substantive Due Process, § IV, p. 448.) He contends the county cannot meet this burden. However, even assuming subdivision (a)(5) is subject to strict judicial scrutiny, based upon certain implied conditions inherent in the subdivision it survives constitutional attack on this ground. (*In re David B.* (1979) 91 Cal.App.3d 184, 192-193 [154 Cal.Rptr. 63].)

The trial court action in this case illustrates the care required of the court in preparing to adjudicate the section 4600 issues. The court had before it all of the alleged additional requirements or safeguards of subdivision (a)(6): the reports of two psychiatrists who examined the father and found him to be presently incapable of adequately caring for or controlling the minor and incapable of so doing in the future. Inquiry into present and future capability was specifically ordered by the court. The psychiatrists also found the father's incapability to care for the minor to be causally related to the father's mental illness.

Parents coming under both subdivisions receive essentially the same treatment. For example, each type is entitled to a required finding of detriment, considerations of the best interests of the child, a finding that no alternatives to termination exist, adequate notice and an opportunity to be heard, meaningful confrontation, right to counsel, written findings of fact and conclusions of law upon request, and proof by clear and convincing evidence. (*In re B. G., supra,* 11 Cal.3d at p. 699; § 4600; *In re David B., supra,* 91 Cal.App.3d 184, 193; *In re Heidi T.* (1978) 87 Cal.App.3d 864, 874 [151 Cal.Rptr. 263]; *In re George G.* (1977) 68 Cal.App.3d 146, 157, 163 [137 Cal.Rptr. 201]; *In re Rose G., supra,* 57 Cal.App.3d 406, 407; §§ 232, subd. (b), 237.5.)

This court has found subdivision (a)(6) to be consistent with substantive due process requirements, even though a showing of actual harm to the child is not made. (*In re David B., supra,* 91 Cal.App.3d at p. 196.) The court did so by reading into the subdivision the requirement that the following be proven by clear and convincing evidence: "(1) that the mental deficiency or illness is settled in that it will continue for an indefinite period of time in the future regardless of medical treatment available to the parent; and (2) that the immediate severance of the parental relationship is the least detrimental alternative available to protect the welfare of the child." (*Id.,* at p. 192.) Such findings were made in the present case. If the hearing required by this decision presents similar evidence, the court will again be

called upon to make these findings. Therefore, as so applied, subdivision (a)(5) is constitutional.

As in *In re David B.*, we similarly read into subdivision (a)(5) the above additional requirements assuring it comports with substantive due process. The facial requirements of subdivision (a)(5) are only those necessary to initiate a termination proceeding, not those necessary to successfully complete one. (See § 232, subd. (a).) Subdivision (a)(5) does not create a per se inference of detriment because the parent has been judicially declared mentally ill.

■■■ Procedural due process is not violated. As noted earlier, section 232 proceedings, under any of its subdivisions, are not carried out in a vacuum. Adequate notice, representation, an opportunity to defend, subpoena and cross-examine witnesses, etc., are all available through the interaction of various principles of California statutory and common law.

■■■ The father argues that, due to the different language and requirements of subdivision (a)(5), he is treated differently than parents against whom actions are brought under other subdivisions of section 232. The father's argument builds upon the false assumption that subdivision (a)(5) is the end, not the means to an end. We repeat: The subdivision only describes the facts necessary to bring an action, not complete one.

■■■ It is also argued that subdivision (a)(5) is unconstitutional *as applied* because it allowed the court to rely upon a prior judicial finding of insanity. Insanity as a defense, the argument goes, requires only that insanity be proven by a preponderance of the evidence. Section 232 proceedings, on the other hand, require proof by clear and convincing evidence. (Compare Evid. Code, § 522 with § 232, subd. (b).)

However, as noted in *In re Franklin* (1972) 7 Cal.3d 126, 137 [101 Cal.Rptr. 553, 496 P.2d 465], the defendant has already demonstrated his dangerous capacity. He elected to defend on the basis of his insanity. He urged the fact of his insanity. Under subdivision (a)(6), the state makes that contention. Though such a defendant usually remains "insane" until some time after being hospitalized, he has periodic opportunities for jury review of his current danger to others. In this case the father has failed in one attempt. He could not convince nine jurors by a preponderance of the evidence that his sanity was restored. The evidence of continued insanity was sufficient to justify his further commitment. ■■■ If he remains hospitalized beyond the maximum penal term, the burden shifts to the prosecution which must convince all 12 jurors, beyond a reasonable doubt, of the con-

tinued insanity. (*In re Moye* (1978) 22 Cal.3d 457 [149 Cal.Rptr. 491, 584 P.2d 1097]; Pen. Code, § 1026.5, subdivision (a).)

 Irrespective of when the termination proceeding is brought and which burden of proof keeps the father in confinement, we find no constitutional weakness in this procedure which relies on proof of a preliminary fact, i.e., a prior adjudication of insanity. Once the preliminary fact of a prior adjudication of insanity has been established, all other findings in the termination proceeding are made by use of the standard of clear and convincing evidence.

The judgment is reversed.

Franson, Acting P. J., and Martin, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 19, 1984.